## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

LORI ANN SALAZAR,

        Plaintiff,

vs.                                    No. CIV 02-0878 JB/RLP

JOHN ASHCROFT, Attorney General
of the United States,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Dismiss, or, in the Alternative, for Summary Judgment, filed September 15, 2003 (Doc. 40).  The primary issues are: (i) whether the Plaintiff, Lori Ann Salazar, is disabled within the meaning of the Americans with Disabilities Act ("ADA"); (ii) whether the Defendant created a hostile work environment; (iii) whether the Defendant failed to accommodate Salazar's disability; (iv) whether the Defendant regarded Salazar as disabled under the ADA; (v) whether the Defendant discriminated against Salazar based on her association with her son, who she alleges is disabled; and (vi) whether the Defendant retaliated against Salazar in violation of either Title VII or the ADA.  Because the Court finds that Salazar was not disabled within the meaning of the ADA, the Court will grant the motion.

## FACTUAL BACKGROUND

### 1.      Salazar's Employment History

Salazar is a federal civil service employee who worked for the United States Attorney's Office ("USAO") for the District of New Mexico, Albuquerque Division, from November 1997 until June 2001.  See Lori Ann Salazar Personnel File.  Before joining the USAO, Salazar worked for the FBI

and the United States Department of Energy.  See Salazar v. Richardson, 1998 WL 1846308 (Nov. 4, 1998); Salazar v. Reno, 1997 WL 777802 (Dec. 11, 1997).  Salazar filed EEO complaints of discrimination and retaliation against both the FBI and the Department of Energy.  See Salazar v. Richardson, 1998 WL 1846308 (Nov. 4, 1998); Salazar v. Reno, 1997 WL 777802 (Dec. 11, 1997); Deposition of Lori Ann Salazar at 127:3 - 25, 129:2 to 130:24, 132:13 to 134:15 (taken May 15, 2003).

During the time that Salazar worked for the USAO, she held the position of Personnel Assistant in the USAO's Administration Division.  See Lori Ann Salazar Personnel File.  She started as a GS-06, and, by the time she left the office, she held the grade of GS-07.  See id.

On June 26, 2001, Salazar quit her USAO job to take a GS-07 position with the Fish & Wildlife Service, Department of Interior.  See Sworn Statement of Anna Quintana at 38:9-25 (taken July 13, 2001); Deposition of Lori Ann Salazar at 13:15-19 (taken May 15, 2003).  Salazar worked at Fish & Wildlife until June 2002, when she transferred to the Minerals Management Service in the position of Human Resources Assistant, GS-7.  See Salazar Depo. at 7:15 to 8:23.

## 2.    Salazar's Supervisory Chain of Command

From August 1998 until January 2001, Salazar reported to Diane Niendorf, the Personnel Officer.  At first, Niendorf had her Personnel Management Specialist, Anna Quintana, do the day-to-day supervision of Salazar, but began doing it herself sometime in December 1998 after Salazar complained that Quintana was badgering her and not treating her fairly.  See Deposition of Diane Niendorf at 23:16 to 24:9, 110:7 to 111:2 (taken July 23, 2003).  Niendorf gave Salazar two appraisals during the time she supervised her, both of which had an overall rating of "Meets to Exceeds Expectations."  Salazar Performance Appraisals of April 2, 1999 and Aug. 8, 2000.

The appraisal system has three ratings: "Fails to Meet Expectations," "Meets to Exceeds Expectations," and "Substantially Exceeds Expectations."   Niendorf's evaluations contain only positive comments, particularly in the areas of maintaining files and records, and prompt processing of background investigations.  Outside investigators found very few problems with the personnel files. See Niendorf Depo. at 96.

In January 2001, Niendorf left the USAO, and Debora Cottrell selected Quintana for Niendorf's replacement, then titled Human Resources Officer.  See Quintana Statement at 5:8-15 (July 13, 2001).  Quintana supervised from January 2001 until Salazar left in June 2001.  See id. at 5:16-22.  Quintana gave Salazar one appraisal during the time she supervised her.  See id. at 33:3-6; Salazar Performance Appraisal of June 26, 2001.  The overall rating was "Meets to Exceeds Expectations," given on June 26, 2001. See id. at 33:7-9, 38:1-8, 39:1 to 48:13.

During most of the relevant period, the head of the Administration Division was Debora Cottrell, the Administrative Officer; Ruth Cox was the Deputy Administrator Officer.  See Niendorf Depo. at 10:17-20.  There were many organizational changes within the Administration Division during the relevant period, with Cottrell shifting job duties and re-writing job descriptions.  See Sworn Statement of Debora Cottrell at 8:1 to 11:23 (taken July 13, 2001); Quintana Statement at 6:15 to 10:23 (July 13, 2001); Niendorf Depo. at 9:13 to 11:8; Job Announcement No. 01-NM-01. The Administrative Division included the Personnel section, where Salazar worked, and sections for Budget, Law Enforcement Coordination, and Computers.  See Niendorf  Depo. at 8:18 to 9:1.

### 3.   Salazar's Work Duties at the USAO

Salazar's duties included processing personnel and payroll actions, processing background investigations, and maintaining performance work plans and appraisals.  See Niendorf Depo. at 13:18

to 14:10.  One of the "other duties as assigned" was a rotating responsibility for the USAO's "court run," which entailed carrying pleadings prepared that day by the Assistant United States Attorneys to the courthouse.  See id. at 27:10 to 28:10.

### 4.    Salazar's Back Injury and Subsequent Absences

The parties dispute how Salazar hurt her back.  The Defendant argues that, on May 10, 1999, Salazar strained her back either during the court run or while moving boxes of administrative files. At the time, she was seven months pregnant.  Salazar argues that she injured her back by first moving heavy boxes and then going on the court run with heavy bags of mail.  See Niendorf Depo. at 27:6 - 9.  She asserts that the court run was not in her regular job description; there were others available to do it; she had asked Katherine Hubbs to remove her from the court runs because, at 38, she was seven months pregnant; but her supervisors said she had to carry the mail anyway.  See Salazar Performance Appraisals of April 2, 1999 and Aug. 8, 2000; Niendorf Depo. at 28:1 - 10; Salazar Depo. at 54:21 to 56:20.

Salazar tried to return to work after a week or two, but was in too much pain.  A co-worker testified that she could tell Salazar was in agony by looking at Salazar.  See Sworn Statement of Kathryn L. Hubbs at 8 (taken November 2, 2000).  Another said Salazar was in so much pain she could not move, or sit for more than a few minutes.  See Sworn Statement of Marilyn Greenberg at 8 (taken November 2, 2000).  Salazar testified she was very distressed after the injury because she could not take pain medications because of the pregnancy, and she had to be in a wheelchair.  See Salazar Depo. at 182-83.  By the time of her deposition in May 2003, Salazar testified that her back was still not healed.  See id. at 24.

The USAO processed Salazar's injury as a worker's compensation claim, and the Office of

Workers' Compensation Program ("OWCP"), a part of the Department of Labor, gave her 45 days'

"continuation of pay" ("COP").  See Niendorf  Depo. at 35:19 - 21.  Under the federal worker's

compensation system, an employee who has been injured on the job is entitled to a maximum of 45

days paid leave initially after an accident.  Salazar was off work until October 12, 1999, because of

her injury and maternity leave.  See id. at 35:6 to 38:12.

Salazar's baby was born on July 18, 1999.  See Salazar Depo. at 64:5 - 13.  Salazar returned

to work on October 12, 1999 after her doctor released her to work four hours a day.  See Niendorf

Depo. at 38:10 - 18; Salazar Depo. at 67:21 to 68:1; Salazar medical record dated Nov. 3, 1999 at

3.  On October 26, 1999, Salazar called in sick, saying she would not be able to come back in to

work.  See Niendorf Depo. at 39:4 - 9; Salazar medical record dated Nov. 3, 1999 at 1.  Salazar tried

the four hour a day schedule again from November 29, 1999, to January 26, 2000, but again was put

off work by the doctor, Dr. William Wellborn,  to whom OWCP sent her.  See Feb. 15, 2000 letter

from Wellborn to Muse.

In Salazar's absences, Niendorf temporarily reassigned Salazar's duties to the three remaining

employees in that unit – herself, Quintana, and Nicole Rinaldi, the student worker.  See Niendorf

Depo. at 30:2 - 10.  Occasionally, employees outside the Personnel unit would help out.  Niendorf

made unsuccessful attempts  to obtain someone on a detail from the Executive Office of the United

States Attorneys in Washington, D.C. or a private contractor.  See id. at 30:2 to 31:16.  The USAO

contends that it also considered trying to fill a position temporarily or to fill an additional position

permanently and issued two vacancy announcements.  See id. at 31:8 to 32:2, 112:2 to 113:6.

Salazar disagrees that the permanent position was an additional position; rather, she contends that

it was apparently her position because when she returned to work half-time, both announcements

were canceled.  See Defendant's Second Supplemental Responses and Objections to Plaintiff's First Request for Production of Documents.

Adequate documentation of medical leave is crucial at the USAO because of the need to comply with OWCP requirements, the need to comply with federal personnel regulations on time, attendance, and leave, to prevent fraud, and to avoid criticism by evaluators who visit the office to check procedures and compliance.  See Niendorf Depo. at 21:4 to 22:20.  On November 18, 1999, Niendorf called Salazar at home to see how she was doing and to discuss when she might be able to return to work.  See Niendorf Depo. at 39:24 to 40:20; Niendorf Memo to the File dated Nov. 19, 1999.  Niendorf's account of the telephone conversation is that she told Salazar she needed to keep the office better informed about her work status, as before that time, she had only been faxing in a doctor's statement every two weeks.  See Niendorf Depo. at 40:9 to 41:4; Niendorf Memo to the File dated Nov. 19, 1999.  Niendorf explained that others were having to do her work, and they were unsure as to when to expect her return.  See Niendorf Depo. at 39:14 to 40:20; Niendorf Memo to the File dated Nov. 19, 1999.  Salazar told Niendorf that she was thinking about requesting a leave of absence, and Niendorf told Salazar that she did not know if the United States Attorney ("USA") would approve the request.  See Niendorf Depo. at 40:5 - 23; Niendorf Memo to the File dated Nov. 19, 1999.  She told her other options would be returning to work on a reduced schedule or resigning and returning to federal employment when she was able.  See id.  Salazar told Niendorf that she would consider her options.  See Niendorf Depo. at 40:5 to 41:4; Niendorf Memo to the File dated Nov. 19, 1999.  Salazar did not submit a written request for a formal leave of absence.  See Niendorf Depo. at 44:14 to 45:4.  The USA, who at that time was John Kelly, must approve any formal leave of absence.  See Niendorf Depo. at 43:16 to 44:6.

Salazar's account of her discussions with Niendorf is different.  Salazar contends that, between October and November, 1999, her supervisors called her several times at home to ask when she would be returning to work.  See Niendorf Depo. at 39:24 to 40:8; Salazar Depo. at 78:12 - 21. Salazar contends that Niendorf kept suggesting that she should resign and let her back heal.  See Salazar Depo. at 65:1-7, 83:8-25; Defendant's Second Supplemental Responses and Objections to Plaintiff's First Request for Production of Documents.   Quintana kept demanding more medical documentation.  See Salazar Depo. at 75:2-3; Defendant's Second Supplemental Responses and Objections to Plaintiff's First Request for Production of Documents.

Salazar returned to work on a four-hour-per-day basis on November 29, 1999. See Niendorf Depo. at 46:9-17.  After Salazar returned in November half-time, Niendorf told her that she was creating a hardship for them; that it was frustrating for them; and that she was not doing as much work as the student.  See Salazar Depo. at 76:1 to 78:4.  When asked at her deposition what sense it would have made for Salazar to resign when she was on approved workers' compensation leave and pay, Niendorf answered:

> The only reason why it would is if she really felt like she needed to be out for a prolonged period of time and she was talking about requesting a leave of absence, and I don't know if she was aware of it, but if she went out on a leave of absence and she was no longer covered under the Office of Workers' Compensation, and of course all this we didn't know one way or the other at the time, but it would be an absence without pay, leave without pay is what it would be, and if she thought she was going to be out for a prolonged period of time, I didn't see an advantage to her doing that versus just leaving and coming back at a later date.

See Niendorf Depo. at 42:12-24.  Quintana testified that she and Niendorf discussed how stressed they were because of having to cover Salazar's work.  See Sworn Statement of Anna Quintana at 11:6-24 (taken Nov. 3, 2000).  Debra Cottrell knew to the percentage point how much Salazar was

out of the office in 1999 and 2000, and testified it was a problem because it stressed Quintana, who had to do the work herself.  See Statement of Cottrell at 25:11 - 25, 41:13 - 25.

In December 1999, Salazar was promoted, on a career ladder basis, to GS-07.  See Niendorf Depo. at 50:13 to 51:18.  On December 29, 1999, Salazar sent an e-mail message to Niendorf, complaining that she had too much work to do in her four-hour schedule.  See Salazar e-mail dated Dec. 29, 1999.  Niendorf agreed to meet with her.  See id.; Niendorf Depo. at 47:5 - 22.

The Defendant asserts that Niendorf agreed to work it out; Salazar disagrees that is what Niendorf agreed to do.  On January 7, 2000, right after the holidays, the Personnel unit met, and Niendorf reassigned Salazar's duty of oversight responsibility for background investigations.  See Personnel Meeting Agenda for Jan. 7, 2000; Niendorf Depo. at 47:23 to 49:17; c.f. July 13, 2001 Statement of Salazar at 6:12 to 7:23.  On January 26, 2000, Niendorf and Salazar met for the purpose of establishing and discussing Salazar's new work plan, as required because Salazar's promotion involved some new responsibilities. See Niendorf Depo. at 49:23 to 51:25; Salazar Depo. at 75:21 to 76:15, 77:14 - 24.  Niendorf explained to Salazar what would be expected of her during the following year and discussed some mistakes she had been making.  See Niendorf Depo. at 49:23 to 52:25, 54:6 - 25.  Salazar became emotional during the meeting and told Niendorf that she was having trouble keeping up with the work.  See Niendorf Depo. at 52:9 - 22.  Niendorf told Salazar that perhaps she had returned to work too soon after her injury, to which she agreed, but said she came back because the OWCP had released her.  See Niendorf Depo. at 52:4 - 25.  Niendorf again raised the alternatives of staying on a reduced work schedule, a formal leave of absence, or resignation.  See id.  Niendorf told her that, because there was a new USA, a leave of absence might be approved.  See Niendorf Depo. at 53:12 - 22.

Salazar left work early on sick leave and did not return to work for over three months.  <u>See</u> Niendorf Depo. at 55:1 - 11.  On January 28, 2000, the office received a medical certificate from her doctor asking that Salazar be excused from work for two weeks, but not indicating the medical reason for the request or a prognosis.  <u>See</u> Injured Worker Status Report dated Jan. 27, 2000.  Quintana, the worker's compensation coordinator in the unit, contacted OWCP and asked for verification that Salazar would be paid worker's compensation, because Salazar wanted to be placed on "leave without pay" status and paid by OWCP.  <u>See</u> Niendorf Depo. at 58:7 - 20; Jan. 28, 2000 e-mail from Quintana to Elizabeth Muse.  The OWCP claims examiner told Quintana that she needed medical verification from Salazar of what had changed to make her unable to work.  <u>See</u> Niendorf Depo. at 58:7 - 20; Jan. 31, 2000 e-mail from Muse to Quintana.

On January 31, 2000, Niendorf called Salazar to discuss the USAO's and the OWCP's need for more information regarding her diagnosis and change of condition, to ask for documentation for OWCP regarding a January 6th doctor's appointment, and to ask on what leave she wanted to be placed pending coverage by OWCP.  <u>See</u> Niendorf Depo. at 60:3 - 11; Niendorf Memo to the File dated Jan. 31, 2000.  Salazar instructed her to put her on annual leave.  <u>See</u> Niendorf Memo to the File dated Jan. 31, 2000.  The next day Salazar sent a fax to Niendorf telling her that she had contacted her doctor and that the report which she had produced earlier was all that he could provide at that time.  <u>See</u> Niendorf Depo. at 60:15 - 24; Jan. 31, 2000 e-mail from Niendorf to Quintana.  The OWCP claims examiner then wrote to the doctor requesting more information and copying Salazar.  <u>See</u> Niendorf Depo. at 61:3 - 13; Feb. 2, 2000 letter from Muse to Dr. Welborn.

On February 14, 2000, Niendorf sent Salazar a letter by courier requesting more information about her medical condition.  <u>See</u> Feb. 14, 2000 letter from Niendorf to Salazar; Niendorf  Depo. at

62:11 - 17; Defendant's Responses and Objections to Plaintiff's First Set of Interrogatories No. 7. Two witnesses testified they had never heard of a courier being used for such a purpose. See Hubbs Statement at 11; Greenberg Statement at 11-12.  The letter advised Salazar that, if she did not provide sufficient information, Niendorf would place her on absent without leave ("AWOL") status. See Feb. 14, 2000 letter from Niendorf to Salazar; Niendorf Depo. at 62:11 to 63:23; Defendant's Responses and Objections to Plaintiff's First Set of Interrogatories No. 7.  In the meantime, Quintana and the OWCP claims examiner continued to work together to obtain the information and to coordinate Salazar's leave status.  See Feb. 24, 2000 e-mail from Quintana to Muse, Feb. 25, 2000 e-mail from Quintana to Muse.

Niendorf did not place Salazar on AWOL status, because on February 24, 2000, Salazar provided a letter dated February 15, 2000, from her doctor saying he had taken her off of work because of "an increase in her depression, anxiety, as well as tenderness and tightness in her neck, shoulder girdles, and lumber region."  See Feb. 15, 2000 letter from Wellborn to Muse; Niendorf Depo. at 65:11 to 66:14.

On March 8, 2000, Niendorf sent Salazar a letter by courier proposing removal from her position because of her physical inability to perform her duties when it appeared Salazar would never be able to return.  See Mar. 8, 2000 letter from Niendorf to Salazar; Niendorf Depo. at 66:15 to 67:3, 124:1 - 15.  Salazar responded to Niendorf on March 10, 2000 and sent a letter to Cottrell on April 6, 2000.  See Mar. 10, 2000 letter from Salazar to Niendorf; Apr. 6, 2000 letter from Salazar to Cottrell.  On May 2, 2000, Salazar sent Niendorf a letter stating she had been released to return to work full-time as of May 15, 2000.  Salazar included an OWCP status report with the letter, which released her to work full-time, with a 20 pound lifting restriction, as of May 1, 2000.  Niendorf

responded with a letter instructing Salazar to return to work on May 8, 2000.  Salazar returned to work on a full-time basis on May 8, 2000, at which time she went off worker's compensation benefits.  See Salazar Depo. at 88:3-5.  Salazar did not lose pay during the time she was out of the office.  See id. at 89:16-17.  While Salazar did not actually lose money during this time period, on two occasions she did not get paid on time and eventually received reimbursement.  See id. at 79:20-24.

5.      **Salazar's Medical History**

Salazar was diagnosed with a lumbar strain and probable sacroiliac injury syndrome.  See Initial Evaluation at 1, dated May 11, 1999; Physical Medicine and Rehabilitation Evaluation at 2, dated December 14, 1999.  She suffered secondary depression as a result of the pain.  See Letter from Barry Rumbles, Lovelace Health Systems, to Liz Adams, R.N. at 1, dated October 26, 1999.  After her injury she saw a number of physicians, pain management specialists, and psychologists.  See id. Doctor Wellborn released her to work full-time as of May 1, 2000, with a 20-pound lifting restriction. See Progress Note, dated May 1, 2000.

Salazar has worked full-time without accommodation (other than a special chair) since May 8, 2000.  Salazar's current hobbies include rollerblading; swimming; tennis; and playing soccer with her children in the parks.  See Salazar Depo. at 12:13 - 13:5.

6.      **Salazar's Subsequent Complaints**

Eight months after Salazar returned full-time, in early January 2001, Niendorf left the USAO. Effective January 14, 2001, Quintana became the new Human Resources Officer, Niendorf's old Personnel Officer position, and began supervising Salazar.  See Quintana Statement at 5 (July 13, 2001).  Later that month, one of Salazar's sons was diagnosed with leukemia.  See Letter from Stuart

-11-

Winter to Anna Quintana, dated January 26, 2000.

Niendorf's departure and Quintana's move into her slot created a vacancy in the Administrative Division. Cottrell, Cox, and Quintana had a series of discussions how to best use that vacancy. See Cottrell Statement at 8; Quintana Statement at 7 (July 13, 2001). Although Quintana wanted the position put in Personnel, Cottrell favored putting it in the financial management area because the office had all accounting authorizations in the District of New Mexico, and the workload was becoming overwhelming. See Cottrell Statement at 8. Cottrell decided to put the position in Financial Management, with the idea that the selectee could help out the Personnel side if time permitted. See id. at 9. The vacancy was posted effective February 2, 2001 open to the whole district, in-house, as a GS-09 Administrative Services Specialist, with duties in the following areas: library budget; monitoring of staffing limits; tracking of projected payroll actions; compliance; national security documents; background investigations; and management of Incentive Awards Program, OWCP, and the Intern and Law Student Program. See id. at 9-10; Vacancy Announcement, dated February 5, 2001. The position also involved management of the High Intensity Drug Trafficking Area ("HIDTA") program. See Cottrell Statement at 9-10; Vacancy Announcement.

Three employees applied for the position: Salazar, Margaret Fisher, and Bev Dennison. See Cottrell Statement at 11-12; Sworn Statement of Ruth Cox at 8 (taken July 13, 2001). Cottrell, the selecting official, did not conduct any interviews because she was already familiar with the applicants and their qualifications, as expressed in those applications. See Cottrell Statement at 12-13; Application of Margaret Fisher; Application of Lori Ann Salazar. Neither Quintana nor Cox made any recommendations to Cottrell. See Cottrell Statement at 12; Cox Statement at 8. Quintana

-12-

testified that all three applicants met the minimum qualifications and she could not say who was best qualified.  See Quintana Statement at 13 (July 13, 2001).  Cottrell selected Fisher.  See Cottrell Statement at 12; Cox Statement at 8.

Cottrell selected Fisher for the position because Fisher had experience dealing with HIDTA, which is one of the programs she would be working with, and also had experience on the litigation side of the office, dealing with transcripts and pleadings.  See Cottrell Statement at 13.  Cottrell had worked with Fisher in the past on a number of projects when Fisher was secretary to the First Assistant United States Attorney ("FAUSA") and was impressed with her qualifications and knew that she would maintain confidentiality and had a Q security clearance, which the other applicants did not have.  See id. at 14.

Salazar contends that she had experience in HIDTA, background checks, budget, payroll actions, travel, document retention and analysis.  She has a college degree in business administration and had also worked as a legal secretary.  See Salazar Depo. at 58-59; Salazar's Application for Administrative Services Specialist Position.  Fisher does not have a college degree and had fewer years total experience and had never worked in administration before.  See Fisher's Application for Administrative Services Specialist Position.  Fisher's background was secretarial and her budget experience consisted of "assisting the FAUSA in the preparation and evaluation of budget submissions; checking the accuracy of budget data."  Id.  Salazar notes that the Defendant refused to produce Fisher's personnel file.  See Defendant's Responses and Objections to Plaintiff's First Request for Production of Documents, Request for Production No. 1 ("[T]he complete personnel files of Margaret . . . Fisher . . . are irrelevant to this suit and production of same would violate [her] privacy rights.").

On Friday, March 30, 2001, Salazar e-mailed Quintana, asking if she could work at home after her husband, who had been at home caring for their sick son, returned to work.  <u>See</u> E-mail from Salazar to Quintana, dated March 30, 2001.  Quintana responded the next working day that she would see what the office could do and that it would be great if Salazar could work at home a few days a week to stay with her son.  <u>See</u> <u>id.</u>  On Monday, April 2, 2001, while Quintana was out of town, Salazar e-mailed her that Salazar's husband was going to be returning to work that next Friday.  <u>See</u> <u>id.</u>

Over the next few days a series of e-mails ensued between the two, discussing Salazar's desire to work at home and a possible compressed work schedule, which would have to be approved by the FAUSA or USA.  <u>See</u> E-mail from Salazar to Quintana and attached e-mail trail, dated April 4, 2001.  On Thursday, April 5, 2001, Salazar e-mailed Quintana a draft request to work a compressed schedule for Quintana's review.  <u>See</u> E-mail from Salazar to Quintana and attached e-mail trail, dated April 5, 2001.  The next morning, without referring to any of their previous communications, Salazar e-mailed Quintana, copying Cottrell, requesting two-months of leave, until June 1, 2001, and indicating she would be applying for voluntary leave donations.  <u>See</u> <u>id.</u>  Salazar was out of the office on approved leave, including Family Medical Leave Act leave and donated annual leave from co-workers, from April 6, 2001 to June 1, 2001.

On June 26, 2001, Quintana gave Salazar her annual appraisal for the period ending March 31, 2001.  <u>See</u> Quintana Statement at 33 (July 13, 2001).  She gave Salazar an overall rating of "Meets to Exceeds Expectations," based on a review of Salazar's work while she was under Quintana's supervision and upon the weekly reports provided by Niendorf when she left the office.  <u>See</u> <u>id.</u>  The narrative portion of the evaluation referred to some errors Salazar had made during the

period, and Quintana told her that she had come close to giving her an unsatisfactory rating on one element.  See id. at 38-50.  Salazar testified that she was documented for errors that occurred during her absence.  See Salazar Depo. at 37-38.

Salazar also testified that Quintana told her not to show this evaluation to prospective employers because they would not hire her if they saw it.  See id. at 18.  Salazar interrupted Quintana during the meeting, telling her that Salazar had decided to quit her job and take a position that U.S. Fish & Wildlife had offered her.  See Quintana Statement at 38 (July 13, 2001).  Salazar contends that she did not interrupt Quintana.  The day after Salazar resigned, she ended up in the hospital emergency room weeping uncontrollably at the loss of her job.  See Presbyterian Behavioral Health Program Psychiatric Assessment, dated June 28, 2001.

On June 6, 2001, twenty days before receiving the appraisal, Salazar submitted an application for the position of Human Resources Assistant, GS-07 at the Fish & Wildlife Service, after hearing about the opening through a friend, Marilyn Greenberg.  See E-mail from Greenberg to Salazar, dated June 26, 2001.  Shortly thereafter, Salazar interviewed for the position, and Greenberg subsequently offered it to her.  See id. ("I offered Lori Salazar the [position] and she accepted it. . . . She is getting her annual appraisal today and she wanted to tell her supervisor herself after her appraisal.").

The Personnel Officers at the USAO and Fish & Wildlife coordinated Salazar's transfer to the different agency.  Quintana advised her counterpart that Salazar could transfer at the beginning of the next pay period, and that is what happened.  Salazar's last day of work at the USAO was Friday, June 29, 2001, and her first day of work at Fish & Wildlife was July 2, 2001.  Salazar lost no pay or benefits when she transferred to the Fish & Wildlife Service.  She was a GS-07 when she left the USAO and assumed a GS-07 position at Fish & Wildlife.

### 7.    Salazar's EEO History

Before working at the USAO, Salazar worked for the Federal Bureau of Investigation, where she filed complaints of sexual harassment and constructive discharge, and the Department of Energy, where she filed numerous complaints of national origin, race, and disability (mental/paranoia, PTSD) discrimination and retaliation in regard to twenty non-selections.  See Salazar Depo. at 127, 129-30, 132-34.  Salazar filed her first EEO complaint against the USAO on April 27, 2000.  See Letter from Salazar to Virginia Howard, dated April 26, 2000.  Salazar amended her complaint twice, on February 22, 2001 and June 26, 2001, to add new claims.  See EEO Complaint and file documents, dated March 6, 2001.[1]

## PROCEDURAL BACKGROUND

Salazar filed her Complaint on July 23, 2002.  Salazar alleges violations of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791, and reprisal by the USAO.  Salazar amended her Complaint on November 14, 2003, after the Defendant filed an interlocutory dispositive motion.  On February 28, 2003, the Honorable Bruce D. Black, United States District Judge, granted the dispositive motion in part, dismissing her claims of sex discrimination under Title VII.  See Memorandum Opinion and Order, filed February 28, 2003 (Doc. 23)(Black, J.).  The parties then conducted discovery on Salazar's remaining claims of disability discrimination and retaliation.

---

[1] Salazar also provides deposition testimony that she asserts relates to a pattern or practice by the Defendant of discriminating against disabled individuals.  See Plaintiff's Response ¶¶ 29-34, at 12-13 (allegations regarding Camile Carpenter, who was pregnant; Gloria Montoya, who broke her pelvis and was in a wheelchair for five weeks; Joan Hart, who had multiple sclerosis; and Ken Berry, whose wife was very ill and he had cancer).  The Court does not believe these facts are material to any of Salazar's claims that the Defendant discriminated against or retaliated against her on the basis of her disability.  The Court has already dismissed Salazar's disparate impact claim under Title VII, which, in any case, was based on gender rather than disability.  See Memorandum Opinion and Order, filed February 28, 2003 (Doc. 23)(Black, J.).

-16-

The Defendant filed a motion to dismiss this case pursuant to rules 12(b)(1) and (6), or, in the alternative, for summary judgment pursuant to rule 56. A rule 12(b)(6) motion may be converted into a motion for summary judgment if matters outside the pleadings are considered. See Miller v. Glanz, 948 F.2d 1562, 1565-66 (10th Cir. 1991). Both parties attached extensive exhibits to the briefing on this motion. The Court, therefore, finds it appropriate to consider this motion as one for summary judgment under rule 56.

### STANDARDS FOR DECIDING MOTIONS FOR SUMMARY JUDGMENT

When reviewing a motion for summary judgment, the Court should keep in mind three principles that the Supreme Court of the United States has set forth. The first of these principles is that it is not the Court's role to weigh evidence; the Court's role is to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1980). The second principle is that the Court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999). Third, the Court cannot decide any issues of credibility in a summary judgment motion. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

Multiple circuits have ruled that, in addition to these standards that the Supreme Court has set, facts that are related to a party's state of mind do not lend themselves to summary judgment. In cases that involve delving into a party's state of mind, the granting of summary judgment is especially questionable. See, e.g., LeFevre v. Space Communications Co. (Spacecom), 771 F.2d 421, 423 (10th Cir. 1985)("'State of mind . . . is difficult to prove and great circumspection is required where summary judgment is sought on an issue involving state of mind.'")(quoting Hahn v. Sargent, 523

F.2d 461, 468 (1st Cir.1975), cert. denied, 425 U.S. 904 (1976) (citations omitted)).  "If plaintiffs claim that some conduct on the part of defendant abridged their First Amendment rights, summary judgment may be precluded because questions concerning defendant's motives or knowledge must be determined."  10B C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 2732.2, at 153-54, 177 (3d ed. 1998).  See Seamons v. Snow, 206 F.3d 1021, 1026 (10th Cir. 2000)("It is axiomatic that a judge may not evaluate the credibility of witnesses in deciding a motion for summary judgment."); Geier v. Medtronic, Inc., 99 F.3d 238, 240 (7th Cir. 1996)("We apply the summary judgment standard with especial scrutiny to employment discrimination cases, . . . which often turn on the issues of intent or credibility."); Sample v. Aldi Inc., 61 F.3d 544, 547 (7th Cir. 1995)("[The summary judgment] standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues.")(internal quotation marks and citation omitted).

Where material facts are not in dispute, summary judgment is appropriate.  Conversely, where there is substantial dispute as to material facts in a case, the Court cannot grant summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1980)("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").

## DISCUSSION

## I.   LAW ON DISABILITY

Salazar's claims of disability discrimination are governed by Section 501 of the Rehabilitation Act of 1973, as amended, which prohibits employment discrimination against individuals with disabilities in the federal sector.  See 29 U.S.C. § 791, as amended.  The Rehabilitation Act shares the same legal principles that govern the Americans with Disabilities Act of 1990, 42 U.S.C. §§

12101 - 12213 ("ADA"), which prohibits employment discrimination in the private sector.  See generally Woodman v. Runyon, 132 F.3d 1330, 1337-41 (10th Cir. 1997)(discussing concepts of "qualified individual" under both acts); Prewitt v. United States Postal Serv., 662 F.2d 292, 301-04 (5th Cir. 1981)(discussing history of the Rehabilitation Act).  The burden shifting analysis established in the Title VII context is the same under the Rehabilitation Act and the ADA in that a plaintiff must first establish a prima facie case of discrimination, after which the defendant must articulate a legitimate, nondiscriminatory reason for its employment decision.

If the defendant offers a nondiscriminatory reason, the burden shifts back to the plaintiff to show a genuine issue of material fact as to whether the defendant's reason for the action in question is pretextual.  See Taylor v. Pepsi-Cola Co., 196 F.3d 1106, 1109 (10th Cir. 1999).  It is the plaintiff who at all times bears the ultimate responsibility of proving that she has been the victim of illegal discrimination based on her disability.  See White v. York Int'l Corp., 45 F.3d 357, 361 (10th Cir. 1995)(citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 113 (1993)).

To establish a prima facie case of disability discrimination, a plaintiff must demonstrate that (i) she is a handicapped person within the meaning of the Rehabilitation Act; (ii) she is otherwise qualified for the position she sought or lost; and (iii) the employer discriminated against her because of the handicap.  See Pushkin v. Regents of the University of Colorado, 658 F.2d 1372, 1386-87 (10th Cir. 1981).  As the Tenth Circuit has stated: "[I]n order to bring any claim under the ADA, a plaintiff must first establish that he is a qualified individual with a disability." Steele v. Thiokol Corp., 241 F.3d 1248, 1253 (10th Cir. 2001).

The inquiry begins with the question whether the plaintiff is disabled; if she is not disabled, she is not entitled to the protections of the Rehabilitation Act or of the ADA.  See Williams v.

Widnall, 79 F.3d 1003, 1005 (10th Cir. 1996).  The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of the individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).  The regulations implementing the ADA define "major life activity" to encompass "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."  29 C.F.R. § 1630.2(i).  "Substantially limits" means "significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."  29 U.S.C. § 1630.2(j)(1)(ii).

The three factors to be considered when determining whether an impairment substantially limits a major life activity are: (i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.  See Lowe v. Angelo's Italian Foods, Inc., 87 F.3d 1170, 1173 (10th Cir. 1996); 29 C.F.R. § 1630.2(j)(2).

The Act does not protect individuals with temporary impairments.  See Pollard v. High's of Baltimore, Inc., 281 F.3d 462, 468 n.2 (4th Cir. 2002)("An impairment simply cannot be a substantial limitation on a major life activity if it is expected to improve in a relatively short period of time."). In Pollard v. High's of Baltimore, Inc., a plaintiff, who alleged that her employer failed to accommodate her and constructively discharged her, claimed that her back injury substantially limited her in the major life activity of working.  The plaintiff injured her back at work, returned after a brief absence, had surgery, was out on leave for nine months, and returned to work with restrictions and modified duties.  She still had difficulty working a full eight-hour day, although released to do so by

her doctors.  She then quit and found immediate re-employment elsewhere.  The United States Court

of Appeals for the Fourth Circuit noted that a temporary impairment, such as recuperation from

surgery, will generally not qualify as a disability under the ADA and found a nine-month absence

insufficient to show permanent or long-term impairment that significantly restricts a major life

activity.  See id. at 467-69.  The court looked to evidence that the plaintiff's doctors saw gradual

improvement and expected her to make a full recovery; significantly, the court also found that

obtaining a new job is evidence that an impairment is not substantially limiting in the major life activity

of working.  See id. at 468, 471.  Summary judgment for the employer was affirmed.

The United States District Court for the Southern District of New York reached a similar

result in Graaf v. North Shore Univ. Hosp., 1 F. Supp. 2d 318 (S.D.N.Y. 1998).  The court dismissed

the case and held that a plaintiff was not disabled, even though he had suffered a severe back injury

which forced him to leave work temporarily, where he was later able to return to work.  See id. at

321-22.  In Gutridge v. Clure, 153 F.3d 898 (8th Cir. 1998), the plaintiff had suffered an on-the-job

injury to his wrist, and, over the next two years, had five surgeries on it.  After each surgery, the

plaintiff was placed on lifting restrictions and given light duty assignments.  After his last surgery, and

return to work on light duty, the plaintiff was terminated because his medical restrictions prevented

him from being able to perform his job duties.  The Court stated: "Disability under the ADA requires

permanent or long-term impairments, see 29 C.F.R. Pt. 1630, App. § 1630.2(j), and impairments

while recovering from surgery are not evidence of a permanent disability."  Id. at 901-902 (citation

omitted).  The United States Court of Appeals for the Eighth Circuit affirmed summary judgment for

the employer because it found no genuine issue of material fact that the plaintiff was disabled.

In Rebarchek v. Farmers Co-op, Elevator and Mercantile Ass'n., 60 F. Supp. 2d 1145 (D.

Kan. 1999), the district court granted the employer's motion for summary judgment. The court found that the plaintiff's back injury, which kept him out of work for four months, was not a disability and held that, as a matter of law, the plaintiff had not shown himself to be disabled within the meaning of the ADA. See id. at 1152. The court did not, therefore, address the merits of the plaintiff's discrimination claims.

In Sutton v. New Mexico Dep't of Children, Youth & Families, 922 F. Supp. 516 (D.N.M. 1996)(Black, J.), the district court granted the employer's motion to dismiss because the plaintiff's complaint failed to allege that her impairment substantially limited a major life activity. See id. at 518-19. The court found that the plaintiff had not sufficiently alleged a disability to survive a motion to dismiss where she alleged that she was diagnosed with degenerative arthritis, worked four weeks with a walker, then had surgery, and was out for four months. See id.

## II.    SALAZAR IS NOT DISABLED WITHIN THE MEANING OF THE REHABILITATION ACT BASED ON THE ADA'S STANDARDS.

Salazar's back impairment was temporary, not permanent. At her deposition, the Defendant asked whether she was disabled at the time of her transfer to Fish and Wildlife (June 2001). Salazar responded: "Not that I could recall. What do you mean by disabled?" Salazar Depo. at 24. Although she alleges she still has problems with her back, these problems have not prevented her from performing her job duties. See id. Salazar returned to work on a full-time basis in May 2000, after her doctor gave her a full release with only some lifting restrictions, which the Defendant honored. See id. at 94-95. Salazar cannot remember exactly when her doctor lifted the restrictions, but thought it was some time before she left the USAO. See id. at 104. She has been able to perform her full range of job duties and is now under no restrictions. See id. at 119.

Looking to the three elements outlined in the regulations attendant to the ADA, as outlined above, the Court does not believe that Salazar has established she is disabled.  Specifically, the duration of her impairment, as well as the permanent or long term impact of the impairment, do not show a disability.  Salazar's doctors released her to work at least part time within months of her injury.  Within two years, Salazar was working full time and since then is able to engage in very physical hobbies.

Further, Salazar did not point the Court to evidence establishing any long term or permanent substantial impairment of a major life activity.  Salazar does not clearly identify which major life activity she feels she was substantially impaired in, although, based on the hearing of this motion, the Court understands that Salazar believes she was substantially impaired in the major life activity of working.  See Transcript of Hearing at 25:15-16 (January 16, 2004).[2]  The Court does not believe Salazar has met her burden to establish that she was substantially impaired in her ability to work for a sufficient duration of time, or permanently.  At most, Salazar was temporarily disabled, which is not enough to bring her under the protection of the Rehabilitation Act based on the ADA's standards.

Alternatively, Salazar argues that, if she was not disabled, the Defendant regarded her as disabled.  That an employer erroneously believes an employee is disabled is sufficient for the employee to fall within the ADA's protection.  See 42 U.S.C. § 12101(2)(C); Doebele v. Sprint/United Management Co., 342 F.3d 1117, 1132-33 (10th Cir. 2003).  "The EEOC's Regulations and Interpretive Guidance make clear that even an innocent misperception based on nothing more than a simple mistake of fact as to the severity, or even the very existence, of an

---

[2] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any finalized transcript may contain slightly different page and/or line numbers.

individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability."

Deane v. Pocono Medical Center, 142 F.3d 138, 144 (3d Cir. 1998).

As support for her argument that the Defendant regarded her as disabled, Salazar points to the following facts: (i)  five months after her injury she tried unsuccessfully to work half time and Niendorf called her at home and suggested that Salazar resign to allow time for her back to heal; (ii) Niendorf posted Salazar's position as open; and (iii) upon receiving a doctor's report ten months after her injury that Salazar's prognosis was "fair,"  Niendorf proposed Salazar's removal from service. Salazar asserts that these facts establish that Niendorf erroneously regarded Salazar as disabled.

Initially, the Court notes that Salazar did not plead a claim of "regarded as" disabled and, in any case, making such an argument at this stage is inherently contradictory.  To now establish that her employer regarded her as disabled, she must establish that she was not disabled and the employer's regarding her as disabled was erroneous.  See  Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 521-22 (1999).("[A] person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities.").   Nonetheless, to meet her burden of showing "regarded as" disability, Salazar must show the following:

> (a) that she has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as construing such limitation;
> (b) that she has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
> (c) that she has none of the impairments defined in 29 C.F.R. § 1630.2(h) but is treated by a covered entity as having a substantially limiting impairment.

McDonald v. Delta Air Lines, Inc., 94 F.3d 1437, 1444 (10th Cir. 1996).  "[A] person is regarded as having an impairment that substantially limits the person's major life activities when other people

treat that person as having a substantially limiting impairment.  The focus is on the impairment's effect upon the attitudes of others."  Id.

Niendorf testified that she did not consider Salazar disabled, but only that "she had a temporary injury that hurt her back."  Niendorf Statement at 29.  Similarly, Cottrell, Quintana and Cox all testified that they were aware of Salazar's injury, but did not testify that they felt Salazar was disabled.  See, e.g., Cottrell Statement at 6-7.  The Court does not believe that the allegations Salazar asserts in support of this argument establish any more than that the USAO believed she had a back injury and they did not know when it would be healed.

Salazar has not created a genuine issue of material fact whether her employer regarded her as disabled.  The Court thus does not believe Salazar has met her burden to establish that she was disabled within the meaning of the ADA.  The Court will, therefore, grant summary judgment in favor of the Defendant on all of Salazar's disability discrimination and retaliation claims.

**III.   EVEN IF SALAZAR HAD ESTABLISHED THAT SHE IS DISABLED, SHE HAS NOT ESTABLISHED A GENUINE ISSUE OF MATERIAL FACT WHETHER SHE SUFFERED DISABILITY DISCRIMINATION OR RETALIATION.**

Salazar asserts that the Defendant discriminated against her on the basis of her disability and then retaliated against her for filing complaints with the Equal Employment Opportunity Commission ("EEOC") for that discrimination.  Specifically, Salazar asserts that the Defendant discriminated against her by: (i) creating a hostile working environment; (ii) failing to accommodate her disability; and (iii) failing to select her for another position based on discrimination by association.  Additionally, Salazar asserts that the Defendant retaliated against her by: (i) giving her a negative appraisal; (ii) failing to select her for another position based on discrimination by association; and (iii) constructively discharging her.  Even if the Court assumes that Salazar were disabled, she has not met her burden

-25-

with regard to her discrimination and retaliation claims.

## A.     SALAZAR'S DISCRIMINATION CLAIMS

As noted above, to establish a prima facie case of disability discrimination, a plaintiff must demonstrate that: (i) she is a handicapped person within the meaning of the Rehabilitation Act; (ii) she is otherwise qualified for the position she sought or lost; and (iii) she was discriminated against because of the handicap. The Defendant does not dispute that Salazar was qualified for her position. Further, assuming that Salazar has established a disability, Salazar's discrimination claims fail because she cannot demonstrate on the record before the Court that the actions she complains about occurred as a result of her disability.

### 1.     Hostile Work Environment / Harassment

Salazar contends that she was harassed on the basis of her alleged disability. It is not clear to the Court that Salazar may bring a claim of harassment or hostile work environment based on a disability pursuant to the Rehabilitation Act or the ADA.[3] Assuming, without deciding, that such a claim is cognizable, Salazar has not established that the conduct of which she complains is disability-related. "Not all harassment falls within the class of conduct prohibited by [law]." Speer v. Rand McNally & Co., 123 F.3d 658, 664 (7th Cir. 1997)("Allegations that Raymond yelled at her, did not make her feel as if she was part of the work group, and gave Speer a negative performance evaluation are not acts of a sexual nature."). See Farpella-Crosby v. Horizon Health Care, 97 F.3d 803, 806 n.2

---

[3] Two circuits have recognized a cause of action for hostile work environment under the ADA. See Flowers v. S. Reg'l Physician Serv., Inc., 247 F.3d 229, 235 (5th Cir. 2001); Fox v. General Motors Corp., 247 F.3d 169, 175-76 (1st Cir. 2001). Several others have assumed, without holding, that such a cause of action exists. Silk v. City of Chicago, 194 F.3d 788, 804 (7th Cir. 1999); Walton v. Mental Health Ass'n, 168 F.3d 661, 666-67 (3d Cir. 1999); Wallin v. Minn. Dep't of Corr., 153 F.3d 681, 688 (8th Cir. 1998). The Tenth Circuit has not addressed the issue.

(5th Cir. 1996)(noting that Title VII does not protect employees from hostile conduct that is not based on their protected status).

Salazar testified that, between October 1999 and May 2000, the harassment consisted of being given too great a workload during the time she was working a four-hour day, being called at home and asked to submit more documentation of her medical condition, being sent a letter threatening AWOL status if the documentation was not provided, being sent a letter of proposed removal by courier service, and being "pressured to resign." Salazar Depo. at 95. After she returned to work in May 2000, she did not feel harassed until January 2001, when Niendorf resigned and Quintana became her supervisor. See id. at 96-97. Salazar then complained of telephone calls, letters, a "meets to exceeds evaluation," and "nit-picking" by Quintana.

None of Salazar's complaints are demonstrably disability-related. That Salazar had suffered a back injury does not convert the office's attempts to obtain the proper medical documentation to support her continued absences and her worker compensation claim into disability discrimination. Here, it is the consequences of Salazar's back impairment that caused her employers to seek adequate documentation, not the impairment itself. Actions resulting as a consequence of disability, rather than as a result of the disability itself, cannot be deemed discriminatory. See Matthews v. Commonwealth Edison Co., 128 F.3d 1194, 1198 (7th Cir. 1997)("He was not discharged because of his disability. He was discharged because of a consequence of the disability--his absence from work the last half of 1991 and his not working full-time the following year.").

Salazar complains that the proposed removal was inappropriate, but she does not point the Court to any USAO policy or procedure that was violated. She also believes the office violated policies by not providing her with adequate supervisory assistance, not allowing her to call individuals

for assistance, and not allowing her to call experts in personnel that would know answers to her questions. Salazar does not, however, point to regulations that the USAO violated. Moreover, Salazar complains that her employer's demands for medical documentation were unnecessary, but she cannot articulate why. See Salazar Depo. at 82 ("Q: Do you have any reason to believe that she made demands that weren't necessary? A: Yes. Q: Specifically what? A: Demanding medical documentation. Q: Why do you think her demands were unnecessary? A: I don't know why. Q: You just think they were too much? A: They were just harassing in nature. They were unnecessary.").

The Defendant further asserts that differences existed between Salazar and Quintana before Salazar's back injury, and that Salazar's manner of addressing Quintana indicates questioning of authority or even subordination. See E-mail from Salazar to Quintana, dated July 24, 2000; e-mail from Salazar to Quintana, dated June 5, 2001; e-mail from Salazar to Quintana, dated March 29, 2001; e-mail from Salazar to Cottrell, dated March 5, 2001. Salazar's complaints regarding Quintana's harassment do not appear to be distinguishable from complaints Salazar made about Quintana before the back injury.

Salazar has not pointed the Court to evidence in the record that her allegations of harassment and a hostile work environment specifically related to her alleged disability. Thus, even if the Court were to agree that Salazar were disabled, she has not established a genuine issue of material fact whether she suffered harassment or a hostile work environment as a result of her disability. The Court will, therefore, grant summary judgment in favor of the Defendant on Salazar's claims for harassment or hostile work environment disability discrimination.

-28-

2.      **Failure to Accommodate**

Salazar also alleges that the USAO failed to accommodate her disability.  First, Salazar contends that the USAO made unsafe physical demands on her by requiring her to go on court runs and placing heavy boxes in her work area during her pregnancy.  See Salazar Depo. at 136.  As the Defendant points out, these allegations relate to work duties before Salazar's back injury and, thus, before any allegation of disability.  The Court will dismiss these claims.

Additionally, Salazar states that the USAO failed to accommodate her disability because "they didn't ask [her] if [she] needed a chair to help [her] sit comfortably."  Id. at 69-70.  The evidence is that Salazar did not request a special chair, that Niendorf attempted to remedy Salazar's discomfort by providing Salazar a heating pad, and that Salazar did receive a special chair once she came back to work full time.  See id. at 70-72.  Salazar also complains that the USAO failed to accommodate her by providing a reduced workload.  See id. at 68.  She concedes, however, that the USAO placed her on a four-hour workday schedule and that she was never asked to stay longer than four hours.  See id.  Salazar's claim is that she was given more work than could be completed in a four- hour period and that Quintana discriminated against her by performing her duties in her absence.  See id. at 68-69, 74.

With regard to Salazar's claims of failure to accommodate by failing to approve her request for a leave of absence, the Defendant asserts that Salazar did not submit a written request for such leave, as is required because only the USA could approve such a request.  Further, "an indefinite unpaid leave is not a reasonable accommodation where the plaintiff fails to present evidence of the expected duration of her impairment."  Rascon v. U.S. West Communications, 143 F.3d 1324, 1333 (10th Cir. 1998).  The Defendant also asserts that it did not deny Salazar's request to work at home

after her son was diagnosed with leukemia.  Instead of tendering a request, Salazar called in and said she would be taking off work for two months.  <u>See</u> Salazar Depo. at 114-15.  There is no duty to accommodate a non-disabled employee by giving her a modified work schedule to enable her to care for a disabled relative.  <u>See</u> <u>Den Hartog v. Wasatch Academy</u>, 129 F.3d 1076, 1084-85 (10th Cir. 1997).

Salazar has not created a genuine issue of material fact whether the Defendant discriminated against her by failing to accommodate her disability.  The record establishes that she received a special chair, that the Defendant did not ask Salazar to work more than her modified four-hour day, and that Salazar did not made appropriate written requests for the leave she complains of not receiving approval for.  The Court will, therefore, grant summary judgment in favor of the Defendant on Salazar's discriminatory failure to accommodate claims.

### 3.    Non-Selection Based on Discrimination by Association

Salazar contends that the USAO discriminated against her by failing to select her for the Administrative Services Specialist position because of her son's illness.[4]  Thus, Salazar contends that this amounted to discrimination by association.  Salazar states that Quintana called her after work on the day the selection of Fisher was announced and told Salazar: "We took into consideration what you are going through with your son, and we don't want to overwhelm you or give you more duties and responsibilities because we know what you are going through with your son."  Salazar Depo. at 50.  Salazar further states that Cottrell came into her office a day or so later and told her: "I thought

---

[4] Salazar also alleges that her own disability caused the non-selection.  Salazar testified, however, that she was not disabled at the time she applied for the position.  <u>See</u> Salazar Depo. at 60 ("Q: At that time, were you disabled?  A: No.  At that time I applied for the position?  Q: Yes.  A: No, I was returned to work on a full-time release.").  The Court will, therefore, only consider Salazar's claim that the non-selection occurred because of her son's disability.

you wanted to go into staffing? . . . And we know what you are going through with your son.  We don't want to give you any more duties and responsibilities.  I want you focused."  Id. at 53.  Both Quintana and Cottrell deny these statements.  See Quintana Statement at 14 (July 13, 2001); Cottrell Statement at 21.

The ADA contains an "association discrimination" provision which prohibits denying an employee a job benefit because of the known disability of an individual with whom that employee has a relationship or association.  See 42 U.S.C. § 12112(b)(4).  The Rehabilitation Act has no such provision and there does not appear to be any case law in which the provision is applied based on the Rehabilitation Act.  The Defendant first asserts that Salazar's son did not meet the requirements of establishing that he was disabled.  See Salazar Depo. at 11-12 (testifying that her son had chemotherapy treatments for two and on-half years and that he is in remission and "doing great.").

Additionally, the Defendant contends Salazar would not have been selected for the position even if her son had not been sick.  Cottrell considered Fisher better qualified, based on her experience in HIDTA, her work as a secretary in a litigation unit of the USAO, and her demonstrated ability as the FAUSA's secretary to maintain confidentiality.  Cox, the Deputy Administrator, who had told Cottrell what she was looking for in  the position, but who had not made a recommendation about the particular candidates, confirmed that Fisher was better qualified than Salazar because of Fisher's legal background (having dealt with legal obligations and transcripts) and familiarity with the HIDTA program.  Where an employer's awareness of the employee's relationship with a disabled individual is not a determining factor in the employment decision, there is no liability and summary judgment is appropriate.  See Den Hartog v. Wasatch Academy, 129 F.3d at 1085; McGuinness v. Univ. of New Mexico School of Medicine, 170 F.3d 974, 980 (10th Cir. 1998).

Additionally, Salazar believed that Fisher was pre-selected for the position.  See Salazar

Depo. at 156-57.  Pre-selection is not forbidden by employment discrimination laws.  See, e.g.,

Brandt v. Shop'n Save Warehouse Foods, Inc., 108 F.3d 935, 938-39 (8th Cir. 1997)(holding that,

although job may have been created and person hired based on friendship, rather than qualifications,

this did not raise inference of gender discrimination); Autry v. North Carolina Dep't of Human Res.,

820 F.2d 1384, 1385 (4th Cir. 1987)(finding that discrimination was not shown by consideration of

friendship or politics in promotion decision); Goostree v. Tennessee, 796 F.2d 854, 862 (6th Cir.

1986)(holding that patronage system based on family, friends, and politics is not the same as sex

discrimination).

The Court is not convinced that Salazar has established that her son fell into the category of

a disabled person so as to invoke the "association discrimination" provision of the ADA.  Even

assuming, however, that her son was disabled, Salazar has not established a genuine issue of material

fact whether her association with her disabled son was a determining factor in the non-selection.  The

record establishes that, even if the Court believes Salazar's assertions that Quintana and Cottrell

referenced her son's illness (which they both deny), Cottrell based her hiring decision on what she felt

were Fisher's better qualifications.  The Court will, therefore, grant summary judgment on Salazar's

claim of discriminatory non-selection.

## B.    SALAZAR'S RETALIATION CLAIMS

To establish a claim of retaliation under Title VII, a plaintiff must show that: (i) she engaged

in protected activity pursuant to Title VII; (ii) she was subjected to an adverse employment action;

and (iii) there is a causal connection between the protected activity and the adverse employment

action.  See Kelley v. Goodyear Tire & Rubber Co., 1174, 1179 (10th Cir. 2000).  The Defendant

stipulates that Salazar has met the first prong, but contends that Salazar cannot meet her burden on the other two prongs.

### 1.    **Performance Appraisal**

Salazar asserts that the performance appraisal Quintana gave her on June 26, 2001 was negative and constituted retaliation for the EEO complaint Salazar filed in April 2000. The Defendant contends that no evidence revealed that Salazar received any negative consequences as a result of this appraisal such that it could be considered an adverse employment action. The appraisal that Salazar received was "Meets to Exceeds Expectations."

Conduct is an adverse employment action if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). The Supreme Court noted that, in most cases, the tangible employment action will result in direct economic harm. See id. at 762. Salazar concedes that Quintana's appraisal did not result in any reduction in her pay or benefits and only that "it could have" resulted in an eventual demotion or denial of promotion, though she was unable to name any promotion she missed out on and admitted she had not applied for any. See Salazar Depo. at 36-37, 40.

The Tenth Circuit has adopted a "case-by-case" approach to what is and what is not an adverse employment action. See Sanchez v. Denver Pub. Schs., 164 F.3d 527, 532 (10th Cir. 1998); Jeffries v. Kansas, 147 F.3d 1220, 1232 (10th Cir. 1998). In Meredith v. Beech Aircraft Corp., 18 F.3d 890 (10th Cir. 1994), the Tenth Circuit held that the plaintiff's receipt of the same type of evaluation that Salazar received would not be an actionable adverse action and that the plaintiff could

not, therefore, establish her prima facie case.  The Tenth Circuit noted that the plaintiff received

satisfactory marks and had presented no evidence showing that such an evaluation was negative or

constituted an adverse action.  See id. at 896.  See also Rivera v. Levitt, 88 F. Supp. 2d 1132, 1144

(D. Colo. 1999)("[U]nder Tenth Circuit precedent, where, as here, a supervisor gives an employee

a performance review that was lower than previous reviews but still within the range of satisfactory,

the employee has not suffered an adverse employment action.").

       While the "Meets to Exceeds Expectations" evaluation may have been lower than Salazar

would have liked, the Court does not see any evidence that it was actually negative.  "If every low

evaluation or other action by an employer that makes an employee unhappy or resentful were

considered an adverse action, Title VII would be triggered by supervisor criticism or even facial

expressions indicating displeasure.  Paranoia in the workplace would replace the prima facie case as

the basis for a Title VII cause of action."  Primes v. Reno, 190 F.3d 765, 767 (6th Cir. 1999)(holding

that attorney's mid-range performance evaluation of "fully successful" was not the adverse

employment action that Title VII contemplated).  Salazar has not established a genuine issue of

material fact whether she suffered an adverse action and, therefore, does not meet the second prong

of the prima facie case with regard to Quintana's performance appraisal.

       Even assuming that Salazar could establish any negative consequences flowing from

Quintana's appraisal, she has not shown any causal connection between the filing of her EEO

complaint in April 2000.  "[U]nless the [adverse action] is very closely connected in time to the

protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to

establish causation."  Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir.

1999)(emphasis in original).  Salazar received the appraisal on June 26, 2001 and filed her EEO

complaint in April 2000 -- a span of about fourteen months.  That time frame is not sufficiently close to establish a causal connection between Salazar's protected activity and Quintana's appraisal.  <u>See</u> <u>Anderson v. Coors Brewing Co.</u>, 181 F.3d at 1179 (noting that a one and one half month period by itself may establish causation, while a three month period may not); <u>Duran v. State of New Mexico</u> <u>Dept. of Labor</u>, 143 F. Supp. 2d 1278, 1284 (D.N.M.)(citing <u>Richard v. ONEOK, Inc.</u>, 120 F.3d 205, 209 (10th Cir. 1997)(affirming district court holding that three-month period, standing alone, is insufficient to establish causation)), <u>aff'd</u>, 26 Fed. Appx. 880, 2002 WL 120527 (10th Cir. 2002)).  Salazar has not pointed the Court to anything more than temporal proximity of fourteen months to establish that Quintana's appraisal was retaliatory.  The Court will, therefore, enter summary judgment in favor of the Defendant on this claim.

### 2.   <u>Non-Selection</u>

Salazar testified that she believed she was not selected for the Administrative Services Specialist position because the selecting official, Cottrell, was a person Salazar had complained about in her EEO complaint, because Cottrell, Cox, and Quintana wanted to retaliate against her for filing a worker's compensation claim, because of her son's disability, and because of her own disability. <u>See</u> Salazar's Depo. at 40-43.  To the extent that Salazar's retaliation claims rest on the same assertions as her discriminatory non-selection claims, the Court has already found that Salazar has not met her burden to sustain them.

Further, the non-selection occurred in February 2001 and Salazar made her EEO complaint in April 2000, a difference of ten months.  While non-selection is an adverse action, this time frame, as noted above, does not provide sufficient temporal proximity to establish a causal connection. Without more, Salazar has not demonstrated a genuine issue of material fact regarding her retaliation

claim of non-selection.  The Court will, therefore, enter summary judgment in favor of the Defendant on this claim.

### 3.   **Constructive Discharge**

A constructive discharge occurs when an employer, through its illegal discriminatory acts, makes working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign.  See Sanchez v. Denver Pub. Sch., 164 F.3d 527, 533 (10th Cir. 1998); Derr v. Gulf Oil Corp., 796 F.2d 340, 344 (10th Cir. 1986).  "If an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged."  Jeffries v. State of Kansas, 147 F.3d 1220, 1233 (10th Cir. 1998).  To establish a claim of constructive discharge, the plaintiff must essentially show that he or she had no choice other than resignation.  See Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1221 (10th Cir. 2002)("The bar is quite high in such cases: a plaintiff must show he had no other choice but to quit."); Yearous v. Niobara County Mem'l Hosp., 128 F.3d 1351, 1356 (10th Cir. 1997)("Constructive discharge occurs when a reasonable person in the employee's position would view the working conditions as intolerable. That is to say the working conditions, when viewed objectively, must be so difficult that a reasonable person would feel compelled to resign."); Schaulis v. CTB/McGraw-Hill, Inc., 496 F. Supp. 666, 676 (N.D. Cal. 1980)("An employer has not effected a constructive discharge merely because an employee believes that she has lost respect or credibility within the company or that she has limited opportunities for advancement.").  In other words, the employment conditions must be objectively intolerable.  See Sanchez v. Denver Pub. Sch., 164 F.3d at 533.

The plaintiff's subjective views of the situation are irrelevant.  See id.  In addition, a majority of the Circuits, including the Tenth, require that the alleged acts of discrimination be accompanied

by aggravating circumstances, i.e., the plaintiff must make a showing of something more than garden-variety acts of discrimination.  See James v. Sears Roebuck & Co., 21 F.3d 989, 992 (10th Cir. 1994)(holding that a court must not base a finding of constructive discharge only on the discriminatory act and that there must also be aggravating factors that make staying on the job intolerable); Irving v. Dubuque Packing Co., 689 F.2d 170, 172 (10th Cir. 1982).

Moreover, in cases involving alleged constructive discharge, the general rule is that a reasonable employee must remain and fight discrimination on the job.  In fact, there is a presumption that, unless the situation becomes intolerable, it is preferable for the employee to seek redress within the context of the employment relationship.  See Derr v. Gulf Oil Co., 796 F.2d 340, 342-43 (10th Cir. 1986)("We agree with the Fifth Circuit's statement in Bourque [v. Powell Elec. Mfg. Co., 617 F.2d 61, 66 (5th Cir. 1980)] that 'society and the policies underlying Title VII will be best served if, wherever possible, unlawful discrimination is attacked within the context of existing employment relationships.'"); Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1015 (7th Cir. 1997)("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress."); Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987) (holding that employee has duty to inform higher management and use available grievance procedures, including the EEOC).  The obligation to seek redress is particularly true given the statutory protections from discrimination and retaliation that Title VII and other statutes afford.  See Derr v. Gulf Oil Corp., 796 F.2d at 344 (10th Cir. 1996); Bourque v. Powell Elec. Mfg. Co., 617 F.2d at 66.

Salazar testified that she felt she had to leave the USAO because of the hostile work environment she was placed under, her unfair evaluations, and her denial of promotions.  She testified

that "the circumstances that happened on a periodic basis led [her] to believe that they were going to set [her] up for failure, and [she] had to leave." Salazar Depo. at 13-14. Although Salazar says Quintana's appraisal was the "last straw," she had applied for the Fish & Wildlife job weeks earlier.

A less-than-desirable appraisal is not such an intolerable situation that would cause a reasonable person to resign, particularly, as here, where the appraisal was not negative. Based on the Tenth Circuit's high standards for establishing constructive discharge, the Court does not believe Salazar has created a genuine issue of material fact whether she was constructively discharged. The Court will, therefore, enter summary judgment in favor of the Defendant on Salazar's constructive discharge claims.

## CONCLUSION

The Court does not believe that Salazar has met her burden to establish that she was disabled pursuant to the ADA. Even if the Court assumes that Salazar has offered evidence to create an issue of fact on her disability status, Salazar has not created any genuine issues of material fact whether the Defendant discriminated or retaliated against her based on her alleged disability, on her son's alleged disability, or Salazar's protected activity in filing an EEO complaint. The Defendant is, therefore, entitled to summary judgment on all claims.

**IT IS ORDERED** that the Defendant's Motion to Dismiss, or, in the Alternative, for Summary Judgment is granted and the Court will enter summary judgment against the Plaintiff, Lori Ann Salazar, and for the Defendant, John Ashcroft.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Hannah B. Best
Hannah Best & Associates
1003 Luna Circle NW
Albuquerque, NM  87102

     *Attorney for the Plaintiff*

Johnny Sutton
  United States Attorney
  Western District of Texas
Susan B. Biggs
  Assistant United States Attorney
  Special Attorney for United States
    Attorney's Office/New Mexico
San Antonio, Texas

     *Attorneys for the Defendant*